FRANK L. PALMER, Bank Commissioner, In Equity

*vs.*

MUTUAL CONSTRUCTION. COMPANY et al.

Androscoggin.    Opinion March 10, 1922.

*The Mutual Construction Company, a corporation incorporated in New Hampshire, but doing business in this State without a license found to be doing practically the same business, and substantially in the same manner, as that done by loan and building associations in this State, in violation of Sec. 120 of Chap. 52 of the R. S.*

In a bill in equity asking for an injunction brought by the Bank Commissioner under Sec. 122 of Chap. 52 of the R. S. against a corporation incorporated in New Hampshire but doing business in this State without a license, and also, against its general agent, it is

*Held:*

1. That the principal object of a loan and building association is to create a loan fund for the benefit of its borrowing members, the underlying idea being that by means of the system of small periodical payments people of limited means will be enabled to become the owners of homes, and thrift, economy and good citizenship will thereby be promoted.

2. In its dominant features, its purpose, its mutuality, membership, payments and loans, the defendant corporation is carrying on a business similar to that of a loan and building association in this State.

3. In some minor details of mechanism the company may differ somewhat from the ordinary loan and building association, but in the essentials it is carrying on a similar if not the same business. It is effecting the same purpose in substantially the same manner.

On report. This is a petition in equity, brought under the provisions of Secs. 120 and 122 of Chap. 52 of the R. S., in the name of the Bank Commissioner, against the Mutual Construction Company, a corporation organized in New Hampshire, and Emile J. Pelletier, its general agent in this State, for the purpose of enjoining the defendants from carrying on business in this State similar to that carried on by loan and building associations in this State, without complying with Sec. 120 of Chap. 52 of the R. S., by being incorporated under the laws of this State for that purpose. The cause was heard before a Justice, upon bill, answers and demurrers, inserted therein and replications and proof. At the conclusion of the testimony, by agreement of the parties, the cause was reported to the Law Court. Bill sustained with a single bill of costs. Permanent injunction to issue against both defendants as prayed for.

The case is stated in the opinion.

*Fred F. Lawrence*, for plaintiff.

*Frank A. Morey*, for defendants.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, WILSON, JJ.

CORNISH, C. J. Sec. 120 of Chap. 52 of the R. S., provides as follows: "Except as hereinafter provided, no person, association or corporation shall carry on the business of accumulating and loaning or investing the savings of its members or of other persons in the

manner of loan and building associations or carry on any business similar thereto within this State, unless incorporated under the laws thereof for such purpose." Section 122 grants a remedy by injunction in case of violation of the statutory inhibition. The original act concerned itself with "the business of accumulating the savings of its members and loaning to them such accumulations in the manner of loan and building associations." R. S., 1903, Chap. 48, Sec. 76. This was expanded by Chapter 42 of the Public Laws of 1905 to include persons, associations or corporations that carry on any business similar to loan and building associations, and it is under this amended section, now R. S., Chap. 52, Sec. 120, that this petition is brought and this injunction is asked.

The single issue is whether the Mutual Construction Company, which was organized in New Hampshire and of which the defendant Pelletier was the general agent in Maine was carrying on any business similar to that of a loan and building association. This raises the initial inquiry as to the distinctive characteristics of a loan and building association.

These characteristics are not to be determined wholly from the existing statutes governing their organization and regulation. Loan and building associations have been in existence in this country for nearly a century and were known in Great Britain for some years before that. The general purpose has been expressed in varying terms, but the main features are the same. "The principal object of a building and loan association is to create a loan fund for the benefit of its borrowing members, the underlying idea being that by means of the system of small periodical payments provided, people of limited means will be enabled to become the owners of homes, and thrift, economy and good citizenship will thereby be promoted." 9 C. J. 920.

In *Pfeister* v. *Wheeling Building Association*, 19 W. Va., 676, this language was used by the court: "Before the passage of any act for the incorporation of building and homestead associations they could be formed and were formed as voluntary associations of parties desiring by concerted action to raise money by small payments and accumulate it till such time as enough had been accumulated to enable each member to build himself a dwelling house and thus acquire a home." See also 4 R. C. L. 343, and cases cited.

The dominant features of such an association, which pertain also to the defendant company, are as follows:

First, Purpose.  This is stated by the company as follows:  "The purpose of our corporation is to encourage the habit of economy principally among the young men and young women and to come to the aid of older persons in procuring a sure and easy means to each to be proprietor of his modest home or to better it."  A loan and building association could not state its purpose more accurately.

Second, Mutuality.  The members are associated on a cooperative basis, having equal privileges and liabilities and sharing equally in profits and losses.  This feature of mutuality and cooperation is made prominent in the plan of the Mutual Construction Company and is emphasized in the advertising pamphlet distributed by the company.

Third, Membership.  In loan and building associations membership is represented by a book stating the number of shares held by such member, and on this book all payments are credited.  In this Mutual Construction Company membership is represented by a written contract, which answers the same purpose, the members being designated in the by-laws as "contract subscribers."

Fourth, Payments.  In this corporation, as in loan and building associations, R. S., Chap. 52, Sec. 104, monthly payments are made by the individuals until an aggregate specified amount is reached.  In loan and building associations the full paid up value of a share is two hundred dollars, and any person may hold any number of shares not exceeding fifty.  Public Laws 1917, Chapter 208.  In this corporation the contract of payment is completed, if we understand the somewhat vague provisions aright, when $1,150 has been paid, $1,000 of which is paid into the building fund so called, and $150 into the administration fund, the latter being designed to cover services and expenses of management.  This fifteen per cent. commission for receiving and paying out money seems rather exorbitant, and in addition there is an entry fee of five dollars and fifty cents on each contract, but these figures affect the prudence and good faith with which the corporation is managed rather than the nature of the business which it is carrying on.

Fifth, Loan Fund.  By means of these small periodical payments a so-called building fund is created in .this corporation which corresponds to the loan fund in the loan and building association.  The

term "building fund" is a misnomer.   It is apparently used to carry out the idea of the word "construction" employed in the name of the corporation which is also a misnomer.   Both are used with the evident design on the part of the managers to hold this corporation out to the world as some sort of a construction company, a company that actually is engaged in constructing or improving houses and intends to perform that work for its contract subscribers when the contracts are completed.   But one looks in vain through the contract and by-laws for a single provision imposing such a duty upon the company.   The idea is in the name alone.   The contract provides for the payment of the entry fee and monthly instalments by the subscribers, and the payment of $1,150 to the subscriber when the required amount has been paid in, and the serial number is reached, the corporation taking a note with such security as it deems sufficient for the difference between the amount paid in and the amount loaned. The subscriber can take this money and build a home or improve one for himself.   No work of that sort is done by the corporation.   It aids in the construction and improvement of homes in the same way that a loan and building association does.   It accumulates the means by which it can be done.   The appellation does not change the character of the business.   The general agent for Maine testified that while two thousand of these contracts had been issued in this State during the three years between 1918 and 1921, the corporation has never built any houses in this State, and, so far as his knowledge goes, had never built any in New Hampshire where the company was incorporated.

In view of these established facts, the purpose, mutuality, membership, method of payments, and building fund accumulated from and loaned to its members on security, we have no hesitation in holding that the general business carried on by the Mutual Construction Company is similar to that of loan and building associations, and for the protection of the people of this State, and especially of those of small means unacquainted with business affairs and with investments, it should come under the control and regulation of the Bank Commissioner.   Justice to our people demands it.   Under R. S., Chap. 52, Sec. 121, the Bank Commissioner has full control over foreign corporations attempting to do a loan and building association business in this State.   He can examine into their affairs, grant or withhold authority, and if they are authorized can order them to

deposit at least $25,000 with the State Treasurer for the protection of citizens of this State with whom they may transact business. From an examination of the contract, by-laws and other exhibits in this case, we think it would be wise and salutary to require that this company be subject to such control and supervision.

There are, of course, many minor details in which the mechanism of this company differs from a loan and building association. Perhaps they were devised in the hope that thereby it might be considered as of a different nature and might escape such control and regulation. But the hope must fade. In the essentials it is carrying on a similar, if not the same, business. It is effecting the same purpose in substantially the same manner, and that is the test. *State* v. *Standard Real Estate Co.*, 80 Kan., 694, 103 Pac. 1006; *State ex rel Standard Home Co.* v. *State Corporation Commission,* 18 N. M. 166, 135 Pac., 75.

This corporation has been before this court on the charge of carrying on a banking business in violation of law. The court then held that the company was not engaged in the business of banking, but also said, possibly by way of dictum, that in important respects the business conducted by it resembled that of a loan and building association and that if any statute was violated it was Section 120 of Chapter 52. *State* v. *Pelletier,* 118 Maine, 257. Further investigation upon proper proceeding brought confirms the truth of this suggestion.

> *Bill sustained with a single bill of costs.*
> *Permanent injunction to issue against both defendants as prayed for.*